**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| DEVITO CYN'CER TISDALE,      ) | |
|      ) | |
|     PLAINTIFF     ) | |
|      ) | |
| V.     ) | CASE NO. |
|      ) | |
| LEXINGTON-FAYETTE COUNTY    ) | |
| URBAN GOVERNMENT,    ) | |
| LEXINGTON POLICE OFFICERS    ) | JURY TRIAL DEMANDED |
| CORY B.VINLOVE, DONNELL    ) | |
| GORDON, LAWRENCE WEATHERS )| |
| in their individual capacities    ) | |
| and unknown officers and    ) | |
| supervisors of the Lexington Police  ) | |
| Department    ) | |
|      ) | |
|     DEFENDANTS.    ) | |

## **COMPLAINT**

NOW COMES Plaintiff, DEVITO CYN'CER TISDALE, by his attorneys LOEVY & LOEVY, and complaining of Defendants LEXINGTON-FAYETTE COUNTY URBAN GOVERNMENT, Lexington Police Officers CORY B. VINLOVE, DONNELL GORDON, LAWRENCE WEATHERS, and other unknown officers and supervisors from the Lexington Police Department, and states as follows:

### **Introduction**

1.    Plaintiff Devito "Vito" Tisdale is a student athlete at the University of Kentucky ("UK").

2.    Now in his Junior year, Mr. Tisdale majors in Community and Leadership Development.

3.     A native of Bowling Green, Kentucky, Mr. Tisdale dreams to one day play in the NFL.



4.     Mr. Tisdale was prolific standout football player during high school. Ranked the Number 3 Kentucky prospect and a top 20 safety in the class of 2020, Mr. Tisdale opted to play football at the University of Kentucky over other schools including the University of Alabama, the University of Georgia, and Texas A&M.

5.     Mr. Tisdale chose to play at the University of Kentucky because he loved the school and program.

6.     Mr. Tisdale selected the University of Kentucky over other programs, in part, because "it's home."

7.     Sadly, Mr. Tisdale's "home" was forever disrupted on the night of March 6, 2021, and the months that followed, when, in March of 2021 and the months that followed, members and guests of the Alpha Sigma Phi fraternity and

2

Defendants from the Lexington Police Department falsely accused him of burglary in the first degree, assault, and of brandishing a weapon.

8.      The lead Detective, Cory Vinlove, a recent graduate from the University of Louisville, knew that probable cause did not exist to charge Mr. McClain with any crime.



9.      Yet, in his quest to further his own career and embarrass the University of Kentucky football program, Defendant Vinlove embarked on a journey to frame Mr. McClain and other black men for a crime they did not commit.

10.     Defendant Vinlove even sought to announce his manufactured false charges on the eve of SEC media day to maximize the exposure and attendant embarrassment to the University of Kentucky and its players accused of crimes they did not commit.

11.     Make no mistake, Defendants' pursuit of Mr. Tisdale and others was never about a search for the truth.

12.     Fortunately for Mr. Tisdale, the "evidence" against him was false, flimsy, and fabricated.

13.     Accordingly, on September 28, 2021, a Fayette County Grand Jury returned a no true bill, thwarting the Defendants' attempt at a wrongful conviction.

14.     Although the charges against him were ultimately dismissed, Mr. Tisdale suffered great prejudice resulting from Defendants' misconduct.

15.     Mr. Tisdale not only faced a potential 25-year sentence of imprisonment if tried and wrongfully convicted, he suffered immense injury to his reputation, his name, image and likeness, his mental health, his college experience and education, and his football career.

16.     Mr. Tisdale now brings this action, pursuant to 42 U.S.C. §1983, for violations of his constitutional rights, seeking some measure of redress for the wrongful and unjustified actions of the Defendants.

## Jurisdiction and Venue

17.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

18.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

19.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all the Defendants reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

## The Parties

20.     Plaintiff Devito "Vito" Tisdale is a 21-year-old African American college athlete who has no criminal convictions.

21.     At all relevant times, Defendant Cory Vinlove was an officer with the Lexington Police Department.  Each of these Defendant Officers are sued in their individual capacities, and each acted under color of law and within the scope of their employment in engaging in the actions alleged in this complaint.

22.     At all relevant times, Defendant Donnell Gordon was a Sergeant at the Lexington Police Department and Defendant Lawrence Weathers was the Chief of the Lexington Police Department. Defendants Gordon and Weathers are sued in their individual and official capacities, and each acted under color of law and within the scope of his employment in engaging in the actions alleged in this complaint.

23.     Defendants Vinlove, Gordon, and Weathers are collectively referred to as the "Defendant Officers."

24.     Defendant Lexington-Fayette County Urban Government is a political subdivision of the Commonwealth of Kentucky and is a first rule class. Defendant Lexington-Fayette County Urban Government ("Lexington") is responsible for the policies, practices, and customs of the Lexington Police Department.

25.     Defendant Lexington-Fayette County Urban Government is referred to as the "Defendant Lexington."

### Alpha Sigma Phi Hosts Party Despite Restriction

26.     On March 5, 2021, the University of Kentucky Office of Student Conduct placed the Alpha Sigma Phi fraternity on "interim restriction." Pursuant to that restriction, the fraternity was not to host any in-person events and/or events with alcohol until the conduct process for that case concluded.

27.     Despite that restriction, less than 24 hours later, the Alpha Sigma Phi fraternity hosted a party at a home on 201 Forest Drive in Lexington.

28.     The fraternity was known for regularly hosting parties at that location.



29.    The chapter's treasurer collected money through Venmo to purchase alcohol for the party, the chapter's social chair lived at the residence, and a fraternity member served as the bartender for the night.

30.    The fraternity announced the party through text messages, SnapChat, and a Group Me page for the fraternity.

### Mr. Tisdale's Teammates Are Invited to the Party

31.    On the night of Saturday, March 6, 2021, Mr. Tisdale's teammates, Rueben Adams and Joel Williams, were hanging out at another teammates' apartment. While there, they learned of the Alpha Sigma Phi party from some of their teammates who had seen the party announcement. Mr. Adams was also invited to the party by a female friend.

32.    Mr. Adams and Mr. Williams believed the party to be an "open invite" party.

33.    Mr. Tisdale and Mr. Williams, along with other teammates, had attended other "open invite" parties there on previous occasions.

### Fraternity Members and Guests Hurl Racial Slurs at Mr. Adams and His Teammate

34.    Between 1:00 and 2:00 a.m. on Sunday, March 7, 2021, teammates Reuben "RJ" Adams and Joel Williams and a friend arrived at the Alpha Sigma Phi party.

35.    Mr. Adams and Mr. Williams arrived at the party in separate vehicles, at approximately the same time. They walked in the open front door together.

36.     Upon entering the residence, Mr. Adams quickly observed that most of the 30-50 people in attendance were heavily intoxicated.

37.     In fact, unbeknownst to Mr. Adams at the time, the Lexington Police Department had been called to the same residence over 13 hours earlier, at 12:43 p.m. that Saturday afternoon, for a noise disturbance and "loud party."

38.     Mr. Adams and Mr. Williams were welcomed into the home by a male member of the fraternity. He was cordial to both.

39.     As Mr. Adams and Williams, both of whom are African American, walked through the home, however, a Caucasian female loudly questioned, "who let the n****** in?"

40.     Other Caucasian fraternity members and guests at the party also began hurling disrespectful, racial slurs toward the young men. Specifically, Mr. Adams heard a Caucasian male call them "p**** ass n******."

41.     A male Caucasian member of the fraternity yelled at Mr. Adams and Mr. Williams to "get the f*** out."

42.     Not wanting to cause any trouble and worried for his and his teammate's safety, Mr. Adams walked towards the back door of the home. Mr. Williams followed.

43.     Mr. Adams made his way out the back door and walked toward his vehicle. He then heard a commotion and walked back towards the home, worried about Mr. Williams, who had not yet made it out.

**Members of the Fraternity Physically Assault Mr. Williams**

44.     As Mr. Adams attempted to leave, male chapter members began pushing Mr. Williams toward the back door. Mr. Williams told the aggressors that he was leaving, but the fraternity members continued their physical assault of Mr. Williams.

45.     Mr. Williams was "jumped" by members of the fraternity before he could exit the back door.  Multiple male chapter members swung, with their fists, at Mr. Williams. Mr. Williams tried to defend himself before being able to finally run out of the back door.

**Members of the Fraternity Assault Mr. Tisdale**

46.     As Mr. Adams and Mr. Williams were attempting to leave the residence, Mr. Tisdale arrived at the party.

47.     Mr. Tisdale knew the house was a "weekend party spot" as he had been to home for parties on previous occasions.

48.     As soon as Mr. Tisdale walked up to the front door, he was ambushed, physically assaulted, and called a "n***** boy." Mr. Tisdale defended himself from the blows being inflicted upon him.

49.     Mr. Tisdale ultimately backed off the front porch, left the residence, and returned to his dorm.

50.     At no point did Mr. Tisdale return to the home.

51.     At no point did Mr. Tisdale have a gun in his possession or witness any other weapon while at the residence.

## Mr. McClain Receives a Text Informing Him
## that Mr. Williams Had Been Jumped

52.     While at his residence under Covid restrictions, Mr. McClain received a text message saying that his roommate and teammate, Mr. Williams, had been jumped by members of the fraternity.

53.     Concerned for his friend's safety, Mr. McClain got out of bed, got dressed, left his home, and drove towards the location of the party.

54.     Once he arrived in the area, however, Mr. McClain was unable to turn on Forest Park Avenue because the road was blocked by law enforcement vehicles.

55.     Accordingly, Mr. McClain drove back to his apartment, without ever getting out of his vehicle.

## Lexington Police Department Investigates

56.     A member of the fraternity called the police.

57.     Police officers from the Lexington Police Department arrived at the home, spoke with the fraternity members and football players who were present, and investigated the alleged assault and burglary.

58.     Because no probable cause existed to charge any of the University of Kentucky football players with a crime, no arrests were made.

59.     Quickly, false allegations surfaced of the football players brandishing weapons at the party. But, those allegations differed greatly. Some fraternity members and guests alleged they saw an individual with a pistol, others alleged they saw up to four individuals with pistols, and others alleged they saw players wielding knives.

60. No weapons were found at the scene or on the person of any of the players who were questioned.

### Mr. McClain Is Falsely Named as Assailant in Altercation and as Brandishing a Firearm

61. Despite never getting out of his vehicle or even making it to the location of the party, Mr. McClain learned from coaching staff that he was being accused as having been present in the home, as having physically assaulted occupants in the home, and as pulling a weapon on one of the fraternity members.

62. Mr. McClain repeatedly denied being present at the party, denied physically assaulting anyone, and denied possessing a firearm.

### The Defendant Officers Receive Physical Evidence that Mr. Adams Did Not Assault Anyone

63. Like Mr. Tisdale and his teammates, Mr. Adams cooperated with the police investigation.

64. Immediately after the false allegations serviced, Mr. Adams voluntarily took photos of hands and knuckles, illustrating that he had not assaulted anyone, and forwarded those to authorities.

65. Mr. Adams denied being personally involved in a physical altercation.

### Defendant Vinlove Takes Over the Investigation and Falsifies Information In Affidavits

66. On or about March 8, 2021, Defendant Cory Vinlove took over the investigation. Despite learning from the beginning of the investigation that it was the fraternity members and their guests who assaulted Mr. Williams and Mr. Tisdale, and not vice versa, and learning that Mr. McClain was not present at the

party, Defendant Vinlove and the other officers refused to charge the individuals who committed the assault and used racial slurs.

67.    Instead, Defendant Vinlove, a white officer, set out to make a name for himself and conspired to frame Plaintiff and his teammates.

68.    To that end, less than three weeks later, Defendant Vinlove fabricated information in a sworn affidavit to a Fayette County District Court Judge to seize the contents of Mr. Adams' cellphone.

69.    Specifically, Defendant Vinlove falsely swore that Mr. Adams admitted to being involved in a physical altercation with two male white occupants of the home resulting in bruising to his knuckles, despite physical evidence to the contrary.

70.    Likewise Defendant Vinlove seized Mr. Tisdale's cellphone and in an April 21, 2021 affidavit for search warrant for the contents of Mr. Tisdale's phone, included the same fabricated information about Mr. Adams as noted immediately above.

71.    Additionally, Defendant Vinlove included the fabricated statement falsely accusing Mr. Tisdale of being in possession of a handgun on the night in question.

**Defendant Vinlove Learns of Information Obtained by the University Clearing Mr. Tisdale of the False Allegations Involving The Firearm**

72.    The University of Kentucky's Office of Student Conduct conducted an investigation and held a formal hearing regarding the false allegations against Mr. Tisdale.

73. On June 16, 2021, the University absolved Mr. Tisdale of the firearm allegation due to the multiple inconsistencies in the "accounts" of the fraternity members and the multiple witnesses who denied seeing Mr. Tisdale with a firearm.

74. Defendant Vinlove and the other Defendant Officers had access to the statements and information the Student Conduct Office obtained during its investigation clearing Mr. Tisdale of the firearm allegation.

75. But in their quest to frame Mr. Tisdale for a crime he did not commit, however, Defendants intentionally ignored that information.

**Defendant Vinlove Learns the Tainted Identification of Mr. Tisdale and his Teammates Does not Establish Probable Cause**

76. Defendant Vinlove and the other Defendant Officers were also provided with information regarding the accusers' alleged identification process of Mr. Tisdale and his teammates.

77. Specifically, the accusers alleged that the fraternity members got together, "threw names out" as to individuals they believed may have been present, and then looked through the football team's roster to pick out individuals who they thought matched the name and description of those they saw the night of the party.

78. Defendant Vinlove also learned that the accusers had been drinking alcohol, the only lights on in the home were in the dining room, and the altercation occurred at approximately 2:00 a.m.

79. Defendants were aware that the narrative and identifications provided by the fraternity members were unreliable.

### The Defendants' Wrongful Prosecution of Mr. Tisdale

80.     Despite having clear evidence to the contrary and no probable cause, on August 17, 2021 - over 5 months since members and guests of the fraternity verbally and physically assaulted Mr. Tisdale and his teammates and four months after the University cleared Mr. Tisdale of the false firearm charge - Defendant Vinlove swore out a Criminal Complaint for Mr. Tisdale.

81.     Therein, Defendant Vinlove initiated charges against Mr. Tisdale for Burglary in the 1st degree, a Class B felony, and Wanton Endangerment in the 1st degree, a Class D felony. No probable cause existed for the initiation of charges.

82.     In so doing, Defendant Vinlove intentionally included false and fabricated information with the express intent on misleading the judicial system into approving false charges against Mr. Tisdale.

86.     Two days later, Defendant Donnell issued a press release including the fabricated allegations against Mr. Tisdale and five other teammates.

87.     That release was picked up by the Associated Press and published by media outlets nationwide, including ESPN, the New York Post, and ABC News.

88.     Defendants forever tarnished Mr. Tisdale's reputation by setting in motion a criminal prosecution lacking probable cause.

87.     On August 20, 2021, a Fayette District Court Judge arraigned Mr. Tisdale on the charges. Mr. Tisdale pled not guilty.

14

**Defendant Vinlove Presents False Testimony to the Grand Jury**

88.     Despite having no probable cause, on September 28, 2021, Defendant Vinlove knowingly presented the false allegations against Mr. Tisdale and his teammates to a Fayette County Grand Jury.

89.     Defendant Vinlove knew that the witness statements used to initiate the burglary and wanton endangerment charges against Mr. Tisdale were false, fabricated, and the product of a tainted identification procedure. Even still, he used those statements to falsely initiate charges.

**Mr. Tisdale's Vindication**

90.     Fortunately, the grand jurors were able to deduce that the "evidence" Defendant Vinlove presented was false and fabricated.

91.     Accordingly, the grand jury returned a no true bill and dismissed the charges against Mr. Tisdale and his teammates.

92.     Mr. Tisdale and his teammates were immediately reinstated as active members of the University of Kentucky football team.

93.     The Tisdale family praised God that the truth finally came out. Mr. Tisdale even posted on social media: "All praise to the most high."

94.     But Defendants' actions had a devastating impact.

**DeVito Tisdale's Damages**

95.     DeVito Tisdale is an upstanding citizen and student athlete who has no criminal convictions.

96.     He is proud to be a University of Kentucky student and football player.

97.     Because of the Defendants' egregious misconduct, Mr. Tisdale was suspended from the UK football team for months. While on suspension, he was not only prohibited from practicing with the team, but he was also banned from eating meals with the team - causing a financial burden - and from conditioning and working out with the team.

98.     He was stripped of participating in the Spring football camp and was not permitted to play in the first four football games of the 2021 season, forever altering his career football statistics. He had to fight to regain the starting position he had before being suspended from the team. He even suffered a season ending injury once returning that is due, in part, to his inability to condition with the team as a result of Defendants' egregious misconduct.

118.     Because of the false allegations levied against him and the damaging national publicity that followed, Mr. Tisdale's name, image, and likeness was tarnished.

119.     He lost endorsements that were pending prior to the fabricated charges and has not obtained any endorsements since, resulting in financial injury in the past, present, and future.

120.     The emotional pain and suffering Mr. Tisdale endured as a result of the Defendants' constitutional violations has been substantial.

121.     Tragically, Mr. Tisdale's mental health suffered greatly as a result of the false allegations levied against him by the Defendants. When on campus, classmates repeatedly asked Mr. Tisdale about the false allegations.

122.    Complete strangers sent disparaging messages to and made derogatory posts about Mr. Tisdale on social media and in public. Neighbors called him disparaging names.

123.    Mr. Tisdale became very depressed and anxious as the false allegations and potential consequences were constantly on his mind.

124.    As a result of the foregoing, Mr. Tisdale has suffered tremendous damage, including but not limited to mental suffering, loss of a normal life and college experience, the threat of physical harm, and damage to his name, image, and likeness, all proximately caused by Defendants' misconduct.

### Count I – 42 U.S.C. § 1983
### Malicious Prosecution

125.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

126.    As described more fully above, Defendants while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

127.    In the manner described more fully above, Defendants made, influenced and/or participated in the decision to prosecute Plaintiff, for which prosecution there was no probable cause and which caused Plaintiff to suffer a deprivation of liberty.  Their misconduct included falsifying evidence and withholding exculpatory and impeachment evidence.

128.   As described more fully above, the prosecution was resolved in Plaintiff's favor.

129.   The Defendant Officers' misconduct directly resulted in the unlawful prosecution and continued deprivation of Plaintiff's liberty in violation of his constitutional rights.

130.   As a result of this violation of his constitutional rights, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

131.    Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Plaintiff's constitutional rights.

132.   The misconduct described in this Count was undertaken pursuant to a routine practice of the Lexington Police Department and the Lexington-Fayette County Urban Government to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

133.   These widespread practices, so well-settled so as to constitute *de facto* policy in the Lexington Police Department and the Lexington-Fayette County Urban Government were able to exist and thrive because municipal policymakers

with authority over these entities exhibited deliberate indifference to the problem, thereby effectively ratifying it.

134.   The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count II – 42 U.S.C. § 1983 – Fourth Amendment
## Fabrication of False Evidence

135.   Each paragraph of this Complaint is incorporated as if restated fully herein.

136.   In the manner described more fully above, the Defendant Officers, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements attributed to witnesses, and fabricated testimony offered at grand jury and other pretrial proceedings.  Defendants knowingly fabricated this evidence and a reasonable likelihood exists that the false evidence affected the decision of the grand jurors and courts that considered this false evidence when determining whether probable cause existed.

137.   The Defendant Officers were acting under color of law and within their scope of employment when they took these actions.

138.   Defendants misconduct directly resulted in the unjust continued prosecution of Plaintiff, thereby denying him from his constitutional right to due process as guaranteed by the U.S. Constitution.  Absent this misconduct, there

would have been no probable cause for Plaintiff's continued prosecution, and the prosecution of Plaintiff could not and would not have been pursued.

139.    As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count III – 42 U.S.C. § 1983
## Supervisory Liability

140.    Each paragraph of this Complaint is incorporated as if restated fully herein.

141.    The continued wrongful detention of Plaintiff was caused by the deliberate indifference and recklessness of supervisory defendants, when they failed to adequately train and supervise the individual Defendant Officers.

142.    Specifically, these supervisory defendants were personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

143.    Furthermore, these supervisory defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and other defendants to engage in a reckless investigation, to coerce and fabricate false

20

inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff.

144.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

145.    The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

146.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

### Count IV - 42 U.S.C. § 1983
### Failure to Intervene

147.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

148.    In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

149.    As a result of Defendants failure to intervene to prevent the violation of Plaintiff's constitutional rights, he suffered pain and injuries, as well as emotional distress.

150.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's rights.

151.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Lexington Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

### Count V - 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

152.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

153.    After the underlying incident, the Defendants reached an agreement amongst themselves to frame Plaintiff for the crimes, and to thereby deprive him of his constitutional rights and his liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

154.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

155.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

156.     As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's constitutional rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

157.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

158.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the Lexington Police Department and the Lexington-Fayette County Urban Government in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

## Count VI - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Lexington-Fayette County Urban Government

159.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

160.     The actions of Lexington Police Department officers in withholding material exculpatory information from Plaintiff and their counsel were undertaken pursuant to the policies and practices of the Lexington Police Department and the Lexington-Fayette County Urban Government, as described above, which were ratified by policymakers with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers

on the requirements concerning the prompt disclosure of newly discovered evidence that exonerates a defendant following his arrest or conviction.

161.    The policies and practices described in this Count were maintained and implemented by the Lexington Police Department and the Lexington-Fayette County Urban Government with deliberate indifference to Plaintiff's constitutional rights.

162.    As a direct and proximate result of the Lexington Police Department and the's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

163.    The Lexington Police Department and the Lexington-Fayette County Urban Government is therefore liable for the misconduct committed by its officers.

## Count VII – State Law Claim
## Malicious Prosecution

164.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

165.    Through their actions as described above, the Defendant Officers caused Plaintiff to be improperly subjected to a prosecution for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of his innocence.

166.    The Defendant Officers accused Plaintiff of criminal activities knowing those accusations to be without genuine probable cause; fabricated evidence and withheld the manner in which that evidence was fabricated; and made statements

24

and reports to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

167. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment and/or official responsibilities.

168. As a result of this misconduct, Plaintiff suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

### Count VIII – State Law Claim
### Negligent Supervision

169. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

170. The municipal defendants, as well as the supervisory defendants, had a duty to properly train and supervise officers, detectives, and supervisor employees of the Lexington Police Department, and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

171. The municipal defendants and the supervisory defendants were grossly negligent and negligent in the training, supervision and discipline of the Defendant Officers, resulting in Plaintiff being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

172.   As a result of this misconduct, Plaintiff suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

### Count IX - State Law Claim
### Defamation

173.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

174.   Defendants waged campaigns against Plaintiff, in which they advanced and caused to be published intentionally false and misleading statements and lies about or concerning Plaintiff that they knew to be false, including repeatedly accusing Plaintiff of crimes he did not commit, and in so doing committed defamation *per se*.

175.   Based upon Defendants' misconduct, including the initiation of charges without probable cause, Defendant Gordon issued a press release containing defamatory statements concerning Plaintiff. These statements were published in news sources around the country, including ESPN, Louisville Courier-Journal, the New York Post, and ABC News.

176.   By engaging in the misconduct described in this Count, Defendants made demonstrably false statements about and concerning Plaintiff, and they caused those statements to be widely published in major public newspapers distributed throughout the entire world. The things these Defendants said and/or wrote about or concerning Plaintiff were malicious, shocking, outrageous, and offensive, and these Defendants made these statements knowing that they were entirely false.

26

177.    The statements made by Defendants described above are wholly untrue accusations of criminal offenses, which constitute defamation *per se* in Kentucky.

178.    These defamatory falsehoods were made with actual malice by Defendants inasmuch as they knew of their falsity or recklessly disregarded their truth or falsity.

179.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to reputational damages, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

180.    In particular, the Defendants' defamatory falsehoods have and continue to injure Plaintiff in the following ways, among others: (a) by impugning Plaintiff's personal reputation in the community such that individuals who Plaintiff interacts with question whether he is a criminal; (b) by limiting Plaintiff's employment options and his future career prospects; and (c) by subjecting Plaintiff to harassment and additional persecution for a crime he did not commit.

181.    The actions and omissions of Defendants set forth in this Count demonstrate malice, egregious defamation, and insult. These Defendants' actions and omissions were undertaken either with malice, spite, ill will, vengeance, or deliberate intent to harm Plaintiff, or with reckless disregard to the falsity of the speech and its effect on Plaintiff. Accordingly, Plaintiff is entitled to punitive

damages and attorneys' fees beyond those damages, described above, that will compensate Plaintiff for injuries resulting from the Defendants' conduct.

## Count X – State Law Claim
## Respondeat Superior

182.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

183.    In committing the acts alleged in the preceding paragraphs, some of the Defendant Officers were members and agents of the Lexington Police Department, acting at all relevant times within the scope of their employment.

184.    Defendant Lexington-Fayette County Urban Government is liable as principals for all state law torts committed by their agents.

## Count XI – State Law Claim

## Negligent Hiring Against Defendant Lexington-Fayette County Urban Government

185.    Each of the paragraphs of this Complaint are incorporated as if fully stated herein.

186.    Defendant City of Lexington and Lexington-Fayette County Urban Government was negligent in hiring Defendant Vinlove as an employee of the Lexington Police Department.

187.    By the time that Defendant Vinlove was employed at the Lexington Police Department, Defendant City of Lexington and Lexington-Fayette County Urban Government knew or reasonably should have known that Defendant Vinlove was unfit for the job for which he was employed.

188.    Defendant City of Lexington and Lexington-Fayette County Urban Government's hiring of Defendant Vinlove created an unreasonable risk of harm to the Plaintiff and others in the Lexington community.

189.    While Defendant City of Lexington and Lexington-Fayette County Urban Government was negligent for hiring Defendant Vinlove, it was also negligent for the retention of Defendant Vinlove.

190.    Defendant Vinlove's misconduct in this case was a predictable – and avoidable – consequence of his employment at the Lexington Police Department.

WHEREFORE, Plaintiff, respectfully requests that this Court enter judgment in his favor and against Defendants and other unknown officers from the Lexington Police Department, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Amy Robinson Staples
*One of Plaintiff's Attorneys*

Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
Margaret E. Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902